UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EUNICE SMITH | : |
| | : Civil No. 3:03cv386(AWT) |
| vs. | : |
| | : |
| STATE OF CONNECTICUT | : |
| DEPARTMENT OF CORRECTIONS | : December 14, 2004 |
| and JOHN ARMSTRONG | : |
| and TERESA LANZ | : |
| and ERIC SOUSA | : |
| | : |

AMENDED COMPLAINT

i.    PRELIMINARY STATEMENT

1.  Plaintiff, Eunice Smith, an dark skinned African-American woman, has brought this

action because defendants have discriminated against her on the basis of her race by

subjecting her to terms and conditions of employment different from those applied to

white employees, for terminating her, and for retaliating against her for her engaging in

protected activities. Defendants have treated the Plaintiff differently from other white

employees by subjecting her to racial harassment, by subjecting her to unequal discipline,

by employing supervisory discretion in a discriminatory manner to unfairly discipline

1

her, by placing her on Administrative Leave, and by terminating her, due to her race and in retaliation for her persistent and continued insistence that defendants desist from their violations of federal and state anti-discrimination laws.

2.  By engaging in acts of intentional racial discrimination, retaliation and unlawful harassment in the workplace against the Plaintiff, the defendants have violated her rights under the Civil Rights Act of 1991, 42 U.S.C. §§2000e, et seq. and 42 U.S.C. §1983, and the 14th Amendment to the United States Constitution.

3.  The plaintiff seeks declaratory and injunctive relief and damages for defendants unlawful actions.

**JURISDICTION**

4.  The Plaintiff has fulfilled all conditions precedent to the institution of this action under 42 U.S.C. 2000(e):

    i.   The Plaintiff filed timely charges with the State of Connecticut Commission on Human Rights and opportunities, (CCHRO) and the Equal Employment Opportunity Commission (EEOC).

    ii.  The Plaintiff subsequently requested and received a Right to Sue Letter from the CHRO dated September 24, 2003 and the EEOC.

5.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1343(a)(3) and

2

(4), 42 U.S.C. §§1981, 1988, and 2000e-2 and the doctrine of supplemental jurisdiction in accordance with 28 U.S.C. §1367.

6. Venue is proper pursuant to 28 U.S.C. §1391(b) since the unlawful acts alleged herein were committed within the State of Connecticut.

**PARTIES**

7. The Plaintiff is a female American of African descent, and has at all times resided in Hartford, Connecticut.

8. The Plaintiff worked as an employee of the Defendant Department of Corrections of the State of Connecticut for about thirteen (13) years until November, 2003, serving at the Hartford Correctional Center, located on Weston Street in the City of Hartford.

9. During the relevant time in question, the said Department of Corrections employed more than 500 individuals.

10. The Plaintiff held the position of Corrections Officer.

11. Defendant John Armstrong was at all times relevant hereto employed as the Commissioner of Corrections by the Defendant Department of Corrections from the beginning of plaintiff's employment, until he left his position voluntarily on or around February 5, 2003.

12. Defendant Teresa Lantz became Acting Commissioner of Corrections on or around

February 5, 2003, when Commissioner John Armstrong resigned his position.  Teresa

Lantz was appointed to the position of Commissioner of Corrections, on or around April

1, 2003, and continues in this appointed position to this day.

13. Defendant Eric Sousa, at all times relevant to this matter was a Lieutenant working for

the State of Connecticut Department of Corrections.

**FACTS**

14. Plaintiff had previously filed complaints of discrimination and retaliation with the

Connecticut Commission on Human Rights and Opportunities ("CHRO") and had on

December 10, 2002 received a release of jurisdiction letter entitling her to commence an

action in court, which she later did.

15. Plaintiff had for a considerable period of time acted as union steward for the AFSCME

Local representing the employees at the Hartford Correctional Center.  In the course of

her representation, she had occasion frequently to advocate vigorously for the rights of

employees and to advocate specifically against discrimination in its various forms,

including racial discrimination.  As a result of such activities, the Defendant Department

of Corrections had a hostile attitude toward Plaintiff.

16. Plaintiff had in fact suffered from repeated instances of discrimination in her own

employment at the Defendant Department of Corrections on the basis of her race or color

4

or both.

17. On information and belief after due inquiry, Plaintiff believes that a pattern of discrimination against persons of African descent or the color of her skin or both exists in the Department of Corrections.

18. On or about May 3, 1993, plaintiff became a union steward, where she thereafter began to insist that the DOC follow their own rules, policies and contract.

19. Thereafter, a series of adverse job actions were taken against Plaintiff, beginning with her wrongful termination on or around October 1995. Further adverse employment actions took place, leading to suspension from her employment on or around January 17, 2003, and to her ultimate termination on or around November 6, 2003.

20. Defendant State of Connecticut Department of Corrections willfully ignored the charges and complaints, both formal and informal, communicated by complainant, relative to the racially discriminatory manner in which African Americans were treated at the State of Connecticut Department of Corrections.

21. Individuals employed by the Defendant Department of Corrections, and members of AFSCME Council 4 and members and administration of Local 1565 including, but not necessarily limited to the named defendants, willfully conspired to deprive plaintiff of her civil rights under state and federal law. Their conspiratorial actions and violations of

plaintiff's civil rights under state and federal law, ultimately led up to the suspension and termination of plaintiff.

22. As a result of the suspension and subsequent termination, Plaintiff has suffered (a) economic losses, including the loss of her salary and job benefits, and (b) non-economic losses, including humiliation, embarrassment, stress, depression, and emotional distress.

23. On or about March 12, 2003, Plaintiff filed a Complaint with the CHRO with respect to the adverse job actions being taken against her with respect to this incident and the case was docketed as CHRO No: 0310390. On September 24, 2003, CHRO issued a release of jurisdiction letter to the plaintiff.

24. The plaintiff is an African American female who previously filed numerous internal complaints of discrimination, dating back to 2/2/02, and numerous CHRO discrimination complaints against the employer, and most recently against AFSCME Council 4 and Local 1565.  (Case Nos. 9610237; 0210362; 0310390; 9/10718 and 0410487 ) Plaintiff has subsequently filed an additional CHRO complaint of Retaliation against the defendants, for retaliation in a Federal Complaint opposing what she reasonably believed to be discriminatory practices on the part of the defendants.   The plaintiff began her employment with the defendant on or about 7-13-90.

25. The plaintiff's position was that of a Correctional Officer.

26. On or about May 3, 1993, plaintiff became a union steward, where she thereafter began to

insist that the DOC follow their own rules, policies and contract.

27. On or around October 1995, plaintiff was wrongfully terminated from her position with DOC.

28. On or about January 31, 1997, plaintiff was reinstated as an employee and as a union steward. Around this time, plaintiff filed a CHRO complaint for harassment, retaliation and discrimination.

29. On or around August 13, 1998, plaintiff filed a grievance against management, to cease and desist their discriminatory practices.

30. On or around November 11, 1998, plaintiff filed a grievance against management for harassment.

31. On or around July 19, 2001, plaintiff became aware of a Violence in the Workplace charge, involving Harris Porter, where actual physical contact took place, and neither of the individuals were terminated from their positions, or arrested, as plaintiff was.

32. On or around 9-26-01, plaintiff filed and internal EEO complaint against Captain Todd Case.

33. On or around January 1, 2002, plaintiff brought up the issues relative to discrimination and harassment at the Labor and Management Meeting.

34. On or around January 19, 2002, plaintiff approached then union president Joe stone, relative to Officer Salvador Pitruzzello inappropriate conduct towards plaintiff and other African-Americans in the department.

35. On or around February 2, 2002, plaintiff filed a complaint to local 1565 president Joe

Stone, against Lt. Smith; Lt. Reyes; Lt. Sousa and Major Gilbert relative to employment

36. On or around May 8, 2002, plaintiff filed a formal complaint to Local 1565 Manuel J. Ray, relative to Officer Pitruzello's conduct.

37. On or about May 8, 2002, plaintiff also wrote Sal Luciano, Council 4 president, requesting an investigation of racial discrimination and harassment at DOC.

38. On or around June 20, 2002, plaintiff contacted Joe Stone, to report that she had been out of surgery for two weeks, and management was still harassing her. She requested that a grievance be filed for this harassment.

39. On or about June 26, 2002, plaintiff filed a formal complaint with Sal Luciano, relative the Hartford County Jail racial discrimination matter.

40. On or around December 10, 2002, CHRO issued a Right to Sue letter for CHRO complaint No. 0210362.

41. On or around January 17, 2003, plaintiff was placed on paid administrative leave, allegedly for threats and workplace violence.

42. On or around January 29, 2003, plaintiff wrote President Gerald McEntee, International President for AFSCME, relative to racisim in union policies, procedures and practices.

43. On or around February 27, 2003, plaintiff received a letter from Constance Derr, responding to the letter plaintiff sent to President McEntee. forwarding this matter to Pat Glynn, Field Services Director for Connecticut (AFSCME).

44. On or around March 12, 2003, plaintiff filed a CHRO employment discrimination (No. 0310390) complaint.

45. On or around March 5, 2003, plaintiff sent a second letter to President McEntee, again reporting inappropriate conduct against African-Americans, and still no action was taken on this matter.

46. On or around September 26, 2003, the NAACP held a press conference on racial discrimination and harassment against minority officers in DOC.

47. On or around October 8, 2003, Tom Mulhall, then President of Local 1565, during a regularly scheduled union meeting, declared that there were not enough minority members present to address concerns relative to concerns of racial discrimination and harassment, thereby taking no action on this matter.

48. On or around June 12, 2003, plaintiff sent a third letter to President McEntee asking for an investigation into the matters of discrimination and harassment.

49. On or around June 12, 2003, plaintiff sent a letter requesting International Presence at a meeting of the local scheduled for June 30, 2003, relative to the matters of discrimination and harassment.

50. On or around September 21, 2003, plaintiff received a letter from Pat Glynn telling plaintiff what she was told, rather than conducting an investigation and reviewing other black DOC employees about matters related to discrimination and/or harassment.

51. On or around November 2003, plaintiff was terminated from her employment.

52. On or around June 16, 2004, plaintiff received an EEOC Right to Sue for Complaint No. 16A-2003-00920).

53. On or around June 18, 2004, plaintiff filed a CHRO discrimination complaint against

AFSCME Council 4; Local 1565 (CHRO No. 0410487). Complaint was filed based on claims of plaintiff being denied proper representation; union aiding and abetting from 11/03 to 1/26/04 and retaliation on or around 1/26/04.

54. On or around July 28, 2004, plaintiff sent another letter to Union Service Representative Joe Aresimowicz requesting arbitration.

55. On or about September 20, 2004, plaintiff sent a follow up letter to her July 28, 2004 request for arbitration, warning the union that failure to respond to her correspondence will result in a suit against them for failure to respond, and failure to properly represent.

56. On or around February 21, 1995, plaintiff was given a written reprimand from Captain Patz for allegedly allowing (Chuck), an inmate, to make phone calls from a restricted area (Restricted Housing Unit) on a day that plaintiff was not even working. Plaintiff disputed the write-up, and spoke with Warden Tozier, however the discipline was allowed to stand and the false accusation remain part of plaintiff personnel record.

57. On or around May 11, 1995, Plaintiff was acting in her capacity as a union steward. Captain Patz began yelling and humiliating plaintiff in front of staff members and inmates, when plaintiff brought up a safety issue as to why dorm four was not shaken down after a staff member had been assaulted.

58. On or about August 13, 1998 plaintiff filed a grievance for retaliation, when she was ordered to move her personal vehicle to another parking space.

59. On or about June 12, 1999 plaintiff was written up by Captain Baynes, black male, for alleged unprofessional conduct towards white female officer Lauray.   Plaintiff was suspended for 5 days. Warden Mary M. Johnson, white female upheld the suspension.

60. On or about June 21, 1999 plaintiff filed a discrimination grievance relative to a post assignment.

61. On or about September 24, 1999 plaintiff wrote to Commissioner John J. Armstrong in regards to a hostile work environment.

62. September 28, 1999 plaintiff filed a grievance relative to retaliation against DOC management and administration.

63. On or about October 21, 1999 Captain Baynes, black male began yelling at plaintiff in the presence of Lieutenant Christopher Coutant, white male, Major Henry Lojkuc, white male, Major Donald Gilbert, white male, and union steward Jody Winslow, white male, with the intent of humiliating and embarrassing plaintiff.

64. On or about November 8, 1999 plaintiff wrote a letter of complaint to Commissioner John J. Armstrong in opposition to being subjected to retaliation and discrimination in the workplace.

65. On or about December 23, 1999 Commissioner John J. Armstrong responded to plaintiff's November 8, 1999 letter condoning his administrators conduct towards plaintiff.

66. On or about March 24, 2000 Labor Management Meeting issues relative to discrimination and harassment were raised by plaintiff and discussed.

67. On or about April 2, 2000 plaintiff complained to Warden Peter Murphy about Lieutenant Erik Sousa's continuous unprofessional conduct, retaliation, and harassment towards her.

68. On or about April 27, 2000 plaintiff issued a complaint to Captain Charles Ruffin when Lieutenant Erik Sousa hung the telephone up on plaintiff while she was inquiring as to why she had not been relieved from duty on April 26, 2000.

69. On or about May 5, 2000 Plaintiff signed a Stipulated agreement with DOC to dispose of a CHRO claim filed by plaintiff.

70. On or about August 12, 2000, plaintiff submitted an incident report in regards to Lieutenant Erik Sousa threatening plaintiff with discipline stating that she failed to respond to a code orange in west block.  In addition, on the same day plaintiff was threatened with being sent home on an already approved (overtime) swap.

71. On or about October 23, 2000 plaintiff observed a black strap fashioned like a noose, hanging in Dorm 1 and 2 control.

72. On or about December 8, 2000, plaintiff filed a formal complaint with the Department of Correction Affirmative Action Unit in regards to a black strap hanging in the form of a noose.

73. On or about January 6, 2001, plaintiff wrote a letter to the Department of Correction Affirmative Action office to the attention of Joe Civitello, expressing plaintiff's concerns with the neck noose. Cm# 7099 3400 0018 2725 9213

**74.** On or about January 18, 2001 Lieutenant Erik Sousa lied on an incident report, stating that he was present during an incident that involved Lieutenant R. Quiros and Officer Marion Baker, which plaintiff witnessed. After Lieutenant Quiros exhibited unprofessional and violent conduct towards Officer Baker in plaintiff's presence, he was promoted to Captain.

75. On or about February 26, 2001, plaintiff wrote a letter to Joe Civitello, in the Department of Correction Affirmative Action office, in regards to the noose incident. Cm# 7099 3400 0018 2725 9190

76. On or about April 2001 plaintiff was mentioned in a derogatory underground news- letter that was written and distributed throughout the facility. Plaintiff addressed this matter verbally, with Warden Peter Murphy.

77. On or about April 16, 2001 plaintiff wrote to Commissioner John J. Armstrong in regards to continuous and ongoing, unprofessional conduct, harassment, retaliation, and discrimination his agents subjected to that staff at the Hartford Correctional Center.

78. On or about May 8, 2001 plaintiff was made aware by Officer Harris Porter in his capacity as a union steward, that he had written to Warden Peter Murphy, complaining about Lieutenant Erik Sousa's demeaning and discriminatory behavior towards black officers at Hartford Correctional Center.

79. On or about May 29, 2001 plaintiff filed a written complaint with Major Mary R. Collins in regards to Lieutenant Erik Sousa's continuous harassing, retaliating, discriminatory and targeting behavior towards her.

80. On or about July 1, 2002 plaintiff wrote to Commissioner John J. Armstrong with concern relative to his plans to send Captain Christopher Coutant back to Hartford Correctional Center, after he had been transferred out of Hartford for racially insensitive conduct and behavior.

81. On or about August 5, 2001 Lieutenant Alfonso Reyes wrote an incident report against plaintiff alleging that he overheard a conversation between another officer and her.

14

82. On or about August 6, 2001 Lieutenant Alfonso Reyes wrote plaintiff up for wearing prescription-shaded glasses. Plaintiff had been wearing these glasses for more than two years.

83. On or about October 29, 2001 During the Labor Management Meeting plaintiff constantly informed the Department's agents of racial harassment, retaliation, discrimination, and disparate treatment in discipline, post assignments, overtime, and more. Plaintiff also requested that the derogatory newsletter that had been circulating with her name in it, to be investigated to determine where and whom it originated from.

84. On or about November 3, 2001 plaintiff submitted an incident report complaining about Lieutenant Erik Sousa's continuous harassment, racial animus and retaliation against her.

85. On or about November 11, 2001 Lieutenant Goddin wrote plaintiff up for going to use the restroom after he had given her permission. Plaintiff filed a complaint with the Department of Correction Affirmative Action Unit on this blatant misrepresentation of the facts by Lieutenant Goddin.

86. On or about December 10, 2001 plaintiff complained to Warden Peter Murphy in regards to Lieutenant Erik Sousa continually harassing and retaliating against her. Warden Peter Murphy told plaintiff that he would not protect her or move his supervisors. Plaintiff

would always be placed under the direct supervision of those agents whom there were identified problems with.

87. On or about January 14, 2002 Teri Hagen from Security Division interviewed plaintiff Per Captain Charles Ruffin in regards to Lieutenant Kenneth Smith's unprofessional and aggressive physical conduct towards her.

88. On or about January 17, 2002 plaintiff attended a Sexual Harassment Hearing at Legislative Building, where she testified about and spoke out and opposed all forms of sexual harassment within the department.

89. On or about January 23, 2002 plaintiff participated in a CHRO public hearing on whether or not to investigate the Department of Correction sexual harassment complaint filed by AFSCME.

90. On or about January 24, 2002 Terri Hagens from the security division and Mr. Bivins from the Affirmative Action Unit of Department of Correction interviewed plaintiff. The interview dealt with Lieutenant Kenneth Smith's unprofessional and aggressive physical conduct towards her.

91. On or about January 28, 2002 During the Labor Management Meeting, plaintiff repeatedly advised the Department's agents of racial harassment, retaliation,

discrimination, and disparate treatment in discipline, post assignments, overtime, and more.

92. On or about January 29, 2002 plaintiff attended the sexual harassment hearing at the legislative office building (LOB).

93. On or about January 29, 2002 Lieutenant Erik Sousa wrote up plaintiff for entering the institution thirty minutes early. Plaintiff believes that Lieutenant Sousa did this out of retaliation, harassment and racial animus towards plaintiff. Plaintiff believes that she is the only union representative and employee with the Department to ever have been disciplined for arriving to work early.

94. On or about February 3, 2002, plaintiff submitted an incident report in regards to Lieutenant Erik Sousa's continuous harassment and retaliation towards her.

95. On or about February 7, 2002 plaintiff attended the Labor Management Meeting, where she again reported to the Department's agents, the continued racial harassment, retaliation, discrimination, and disparate treatment in discipline, post assignment, overtime and other areas relative to African-American employees.

96. On or about February 20, 2002 plaintiff observed Lieutenant Gregory Barnette secretly video taping her from behind during outside rounds. Plaintiff represented a female officer, who was sexually harassed by Lieutenant Barnette.

97. On or about March 5, 2002 plaintiff filed complaint with CHRO against Department of Correction based on retaliation, harassment, and discrimination.

98. On or about March 13, 2002 plaintiff represented Officer Bruce Denby, an African-American male during an inquiry with the Department's security division. Plaintiff was retaliated against for supporting and representing black employees at DOC.

99. On or about March 15, 2002 plaintiff wrote a letter to Major Mary R. Collins, reporting the continuous harassment, racial discrimination and retaliatory treatment she had been subjected to by Lieutenant Alfonso Reyes.

100.      On or about March 19, 2002 plaintiff observed Officer Autuno and Camp engage in a heated verbal confrontation, no disciplinary action was taken against either party.

101.      On or about March 20, 2002 plaintiff was made aware that Dorm 1 had to be evacuated due to carbon monoxide fumes. Plaintiff had submitted several work orders reporting getting sick when assigned to work in this particular environment.

102.      On or about March 22, 2002 Lieutenant Erik Sousa engaged in harassing and taunting   conduct against plaintiff while she was on post.   Plaintiff reported this harassment by defendant Sousa, and requested that administration view the videotape of his discriminatory, retaliatory and harassing conduct.

103.    On or about March 26, 2002 plaintiff wrote to Commissioner John J. Armstrong in regards to retaliation, harassment, targeting, and discrimination that she continued to be subjected to by DOC management and administration.  (Cm# 7001 1940 0007 9856 5662.)

104.    On or about March 29, 2002 plaintiff was forced to seek psychological support and counseling through Clinical psychologist Harold Fisher relative to the harassment, retaliation, and discriminatory treatment she was subjected to by the defendant department's agents.

105.    On or about May 20, 2002 Commissioner John J. Armstrong wrote to plaintiff expressing concern over how plaintiff was feeling after becoming ill at work. Plaintiff had become ill due to excessive heat in the dorm. Plaintiff had filed numerous work-orders with the area supervisor.

106.    On or about August 13, 2002 plaintiff requested a complete copy of the investigative report relative to the incident on March 22, 2002, involving Lieutenant Erik Sousa in which Captain Savvador and Irizzary conducted a security division investigation.  Plaintiff needed documentation and proof of the investigation that resulted in her suspension.

107.    On or about September 20, 2002 Warden Levester terminated plaintiff's overtime assignment while plaintiff was on overtime duty because plaintiff was wearing colored beads in her hair.  Prior to this incident, plaintiff had been wearing these colored beads for approximately three months, without incident.

108.    On or about September 23, 2002 plaintiff faxed a written incident report to Commissioner John J. Armstrong office, reporting Warden Nelvin Levester's disrespectful and retaliatory conduct towards her.

109.    On or about April 4-7, 2002 plaintiff attended the AFSCME sponsored Women's Conference, where she learned how to address issues relative to female employees, including strategies to assist or ensure that female employees have their own restroom. Because of Plaintiff's efforts and accomplishments in this area of women's rights, plaintiff believes that the Defendants subjected her to further retaliation, harassment, and discrimination.

110.    On or about April 9, 2002 plaintiff was again forced to seek psychological counseling through Clinical psychologist Harold Fisher in order to assist her in coping with the ongoing and continuous discrimination, harassment and retaliation, that she was subjected to in the workplace.

111.    On or about April 11, 2002 plaintiff was given a pre-disciplinary hearing on January 29, 2002 involving defendant Erik Sousa, when he wrote her up for coming to work early.

112.    On or about April 11, 2002 plaintiff was questioned by Captain Charles Ruffin in regards to Officer Pittruzello accusing plaintiff of defaming his character. Plaintiff had to transport Officer Pittruzello to St. Francis Hospital for treatment. During this transport, Officer Pittruzello shared confidential and personal information with plaintiff. Plaintiff reported this incident to Captain Ruffin, and Captain Ruffin required that she do an incident report outlining the confidential information Pitruzello shared with her. Plaintiff was not comfortable writing this personal information in an incident report, and consequently, management attempted to discipline plaintiff for alleged unprofessional conduct.

113.    On or about April 22, 2002 plaintiff had another appointment with Clinical psychologist Harold Fisher to assist her in coping with the harassment, retaliation, and discriminatory treatment she was subjected to by the Defendants.

114.    On or about May 1, 2002 plaintiff made public comments in opposition to discriminatory treatment of women at a sexual harassment hearing at the legislative office building, where legislators were present.

115.     On or about May 3, 2002 plaintiff had another appointment with Clinical
psychologist Harold Fisher in regards to the harassment, retaliation, and discrimination
treatment she was subjected to from the department's agents.

116.     On or about May 13, 2002 plaintiff represented Officer Robert Taylor, black male
at a grievance hearing for disparate treatment based on race. Plaintiff believes that the
presentation of the facts that proved disparate treatment caused further retaliation,
harassment, and discrimination against her.

117.     On or about May 14, 2002 Captain Savvador and Irizzary interviewed plaintiff in
regards to an alleged incident of racial animus on March 26, 2002 involving Lieutenant
Erik Sousa.

118.     On or about May 16, 2002 plaintiff represented Officer Bruce Denby at a
grievance hearing concerning disparate treatment based on race. The plaintiff believes
that the presentation of the facts that proved disparate treatment caused further retaliation,
harassment, and discrimination against her.

119.     On or about May 19, 2002 lieutenant Gregory Barnette's aggressive and ongoing
harassment  targeted towards plaintiff immediately before roll call, caused plaintiff to
become excited and agitated causing her to have an asthma attack.  Plaintiff was
transported to Hartford Hospital via ambulance following this incident.

120.    On or about May 9, 2002 Lieutenant Barnette retaliated against plaintiff by refusing to allow plaintiff a bathroom break, or an officer to relieve her from her post, causing plaintiff to urinate on herself. Defendant's were given documentation from plaintiff's doctor that it was difficult for her to hold her urine, and she needed to have regular bathroom breaks. Plaintiff should not have been assigned to Lieutenant Barnett, because she had been involved in a sexual harassment case against him in the past, and he had issues with her.

121.    On or about May 21, 2002 Captain Weir and Counselor Supervisor Barnard went to the Hartford Correctional Center to interview plaintiff about her complaint filed with the Affirmative Action Unit. This complaint was filed against Lieutenant Gregory Barnette for his insensitive response to plaintiff's need to use the restroom, thereby causing plaintiff to urinate on herself.

122.    On or about May 30, 2002 plaintiff went out for surgery, expecting to return for duty on or about July 30, 2002. She was harassed while out on medical leave, and when she returned to work, they attempted to transfer her.

123.    On or about June 3, 2002 plaintiff attend sexual harassment hearing at legislative building, which she addressed her concerns and issues involving retaliation, harassment,

23

and discrimination against black employees who speak out against racism and sexism with the Department of Correction.

124.    On or about June 13, 2002 plaintiff received a certified letter informing her of 1-day suspension awaiting her for an alleged incident with Lieutenant Sousa on January 29, 2002 from Warden Nelvin Levester.

125.    On or about June 13, 2002 plaintiff attended her own CHRO hearing, and represented Officer Bruce Denby at a grievance hearing on this date. Plaintiff was subjected to retaliation and harassment after these hearings.

126.    On or about June 18, 2002 after plaintiff represented Officer Bruce Denby at a grievance hearing she was subjected to more retaliation and harassment.

127.    On or about July 17, 2002 plaintiff was telephoned at her residence by Captain Weir in regards to scheduling a time to meet with her. Per the Department administrative directive, all inquiry on conducted on the employee's scheduled day on.

128.    On or about July 30, 2002 the Department of Correction attempted to involuntary transfer plaintiff to Carl Robinson Correctional Institution, which was effective as of July 31, 2002, for an alleged incident involving Lieutenant Erik Sousa on March 22, 2002, someone whom she has continuously complained about in regards to being retaliated, harassed, and discriminated by. The involuntary transfer was also against the wishes as

well as concerns of her private physician that plaintiff needed to remain in Hartford for medical reasons.

129.     On or about August 7, 2002 plaintiff was forced to see departments doctor Dr. Stahl, an occupational doctor for Clarence back to work. Plaintiff believes that Dr. Stahl has no knowledge or expertise with any areas of her medical condition.

130.     On or about August 9, 2002 plaintiff attended a press conference across the street from Hartford Correctional Center. Officer Gaiser who was posted in center control informed plaintiff that upper management had the camera from center control on the conference pointing out who had attended.

131.     On or about August 12, 2002 plaintiff wrote a letter to Commissioner John J. Armstrong in regards to the blatant retaliation that she had been subjected to ongoing. Certified mail # 7002 0860 0004 6254 02201.

132.     On or about August 14, 2002 payroll clerk Patty informed plaintiff, that Personnel Officer Nora Ryan informed her to dock my pay from 7-30-02 thru 8-02-02. Plaintiff believes that this was in retaliation for her speaking out against sexual harassment and racism while out on medical leave.

133.     On or about August 16, 2002 plaintiff spoke with Dan Callahan in regards to retuning back to Hartford Correctional Center.

134.     On or about August 19, 2002 plaintiff spoke with Dan Callahan on same issue of plaintiff returning to Hartford Correctional Center.

135.     On or about August 19, 2002 plaintiff attended a meeting with the other women involved with the sexual harassment complainant against the department.

136.     On or about August 20, 2002 plaintiff spoke with Senator Edith Prague with officer Bruce Denby present in regards to the blatant racism and racial retaliation that we were being subjected to everyday within the workplace. Plaintiff also reminded Senator Edith Prague that she was a named complainant with the sexual harassment suit.

137.     On or about August 20, 2002 plaintiff spoke with Dan Callahan on same issue in regards to returning to Hartford Correctional Center.

138.     On or about August 22, 2002 plaintiff was made aware that Officer Nichols, a white male had left facility unauthorized and went to central office.

139.     On or about August 26, 2002 after plaintiff return back to work from an extended medical leave, due to an attempt to involuntary transfer her to Carl Robison Institution, Warden Levester tried to verbally convince plaintiff that he had nothing to do with the attempt to transfer plaintiff to Carl Robinson institution. Carl Robinson institution is also the facility in which Captain Todd Case was transfer to for his conduct towards her and other staff at the Hartford Correctional Center.

140.     On or about August 27, 2002 plaintiff was assigned to a perimeter post, which is a sit down post, after receiving medical documentation that plaintiff is unable to sit for long periods for medical reasons, this request was ignored.

141.     On or about August 29, 2002 plaintiff wrote letters to Warden Nelvin Levester asking him if he could keep Lieutenant Gregory Barnett, black male sexual predator and Erik Sousa, white male racist away from plaintiff. Plaintiff also sent a copy to Commissioner John J. Armstrong. Both agents informed plaintiff that that were not going to move their supervisors because plaintiff felt that there was a problem.

142.     On or about September 9, 2002 Warden Levester ordered plaintiff that she could not wear colored beads in her hair. He then stated to plaintiff that he did not say anything the day before because plaintiff had worn the shells. On this same day, plaintiff was served with a 1-day suspension for arriving to work thirty minutes early, which plaintiff has done for her thirteen years of employment with the Department of Correction. Lieutenant Sousa, whom she continued complaining about in regards to harassment, retaliation, and discrimination, initiated this suspension.

143.     On or about September 11, 2002 plaintiff notified Lieutenant Arnold that she had not been relieved for chow. Plaintiff reminded Lieutenant Arnold that she was a diabetic and needed to eat. Lieutenant Arnold informed plaintiff that they are behind schedule due

to the 9/11 ceremonies and had to wait. Plaintiff personal doctor had informed the department in September of 1997 of plaintiff diagnose of diabetes.

144.     On or about September 12, 2002 plaintiff witness officer Boudreaux being placed on Administrative leave with pay after Officer Jon Edwards alleged that Boudreaux assaulted him. Boudreaux was later transferred to MacDougall. There were no witnesses to the alleged assault.

145.     On or about October 8, 2002 plaintiff attended her appointments with Clinical psychologist Kim Newland-Carter, in regards to the harassment, retaliation, and discrimination treatment which she was subjected to from the department on a daily bases.

146.     On or about October 10, 2002 plaintiff wrote a letter to Commissioner John J. Armstrong requesting copies of all investigative packages involving her. Per the Department of Correction Administrative Directive 1.10 anyone subjected to an investigation is entitled to a complete and clear copy of the investigation at no cost. Plaintiff never received these copies.

147.     On or about October 11, 2002 around noon plaintiff informed Lieutenant Bowels that she was not feeling well. Asked him to take her off the 4-12pm overtime for that day

and went home. Approximately 5:30pm Lieutenant Devore telephoned plaintiff home inquiring why she was at work for the 4-12pm shifts.

148.    On or about October 12, 2002 plaintiff asked Lieutenant Bowels about October 11, 2002, which was in regards to plaintiff being at home on the 4-12shift after becoming ill at work. Lieutenant Bowles stated that he forgot. Plaintiff believes that this was further harassment and retaliation against her.

149.    On or about October 14, 2002 Rev Pitt spoke to plaintiff in regards that Warden Levester wanted him to speak to her and determine whether he and plaintiff could clear the air. Plaintiff believes that Warden Levester wanted to clear the air, because she believes that he knew that he was wrong in walking her out of the facility for wearing beads in her hair, which she had been doing for months.

150.    On or about October 18, 2002 plaintiff thought that Captain Weir and Counselor Supervisor Bernard came to speak with plaintiff in regards to the Affirmative Action Complaints that she had file with the State of Connecticut Department of Correction in regards to retaliation, discrimination and harassment that plaintiff had been subjected to. Instead, the meeting focused on why plaintiff did not file the complaint the specific form in which the Affirmative Action United wanted. Plaintiff believe that this was to delay

plaintiff of any relief from the retaliation, harassment, and discrimination she was subjected to on a daily bases.

151.    On or about October 21, 2002 plaintiff asked the agency why precautionary measures were not taken after counselors Patterson and Stinson were exposed to a white power substance.

152.    On or about October 29, 2002 while in roll call, Warden Acosta entered and walked over to where Officer Denby and plaintiff was standing and stood near them. He asked if we could here Lieutenant Erik Sousa who was intentionally speaking very low. Warden Acosta did not walk and stand near anyone else or asked that questioned.

153.    On or about November 10 thru 14, 2002 plaintiff received-five days suspension for her signature not being signed in the back of the log book indicating that she read and understood the post orders. Plaintiff believes this was in retaliation from Lieutenant Sousa, because she had complained about him harassing and targeting her. When plaintiff requested the agency to review the videotape of the area, to show Lieutenant Sousa' unprofessional demeanor towards her, the agency refused.

154.    On or about December 5, 2002 plaintiff became ill at work. And on or around December 7, 2202 plaintiff telephoned the facility informing Lieutenant DeVore that she

had been admitted to Hartford Hospital with stomach pains and did not know when she would be discharged.

155.     On or about December 11, 2002 plaintiff again plaintiff telephoned the facility informing Lieutenant Goddin that she was being discharged from the hospital on this date and would be reporting back to duty on December 12th.

156.     On or about December 12, 2002 plaintiff hand delivered her doctor's note to the Hartford Correctional Center clearing her to return to duty. This note was given to the warden's secretary, Sandy and asked if she would to give it to Captain Charles Ruffin the next day because he was not on duty that day. The warden was presented and asked plaintiff how she was feeling because he was told that plaintiff had been ill.

157.     On or about December 13, 2002 Captain Ruffin asked plaintiff, while on post as Visiting Security Officer, did she call in everyday out sick. Plaintiff found this conversation odd, because plaintiff ensures that she follows the policies and procedures as they are written.

158.     On or about December 24, 2002 Captain Ruffin handed plaintiff an attendance warning informing her that her attendance for December 8, 2002, while hospitalized, has been recorded as unauthorized leave without pay and it shall be docked from the

appropriate pay check. Plaintiff believes that this action was another incident of harassment and retaliation.

159.     On or about December 26, 2002 plaintiff appealed the unauthorized leave to Warden Remi Acosta, as of this date plaintiff have not received a response.

160.     On or about January 17, 2003 in retaliation against plaintiff Union Steward Patricia Acker Gonzalez fabricated that plaintiff had threaten to shot her between the eyes, placed on administrative leave. This was in retaliation for demanding that AFSCME investigate Union Steward Pitruzzello, in regards to his racial attitude and conduct toward fellow members. Union Steward Gonzalez and Pitruzzello were very good friends.

161.     On or about January 24, 2003 plaintiff wrote to Commissioner John J. Armstrong in regards to receiving a copy of the investigation when Officer Erik Wolliston accused plaintiff of sexual harassment. This allegation by Officer Wolliston was in retaliation because plaintiff spoke out against sexual harassment within the Department of Correction.

162.     On or about January 17, 2003, plaintiff was placed on Administrative Leave in retaliation for her ongoing and continuing opposition to defendant's discriminatory actions. On or around November 6, 2003 plaintiff was terminated.

## IV.    CAUSES OF ACTION

## COUNT ONE: VIOLATION OF 42 U.S.C. 2000e ET SEQ. (DISCRIMINATION)

163.    Paragraph 1-162 are incorporated by reference.

164.    The acts, practices, and treatment of the defendants intentionally subjected the Plaintiff to discrimination on the basis of her race and color in violation of the rights secured by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §. 2000e *et seq.*

165.    The plaintiff has suffered compensable loss as a result of the violation of the defendants, including loss of civil rights, economic losses in the form of lost wages, seniority, pension and benefits related to her employment.

## COUNT TWO: VIOLATION OF 42 U.S.C. 2000e ET SEQ. (RETALIATION)

166.    Paragraphs 1-165 are incorporated by reference.

167.    Defendant's treatment, discipline and discharge of plaintiff under the circumstances detailed herein was in retaliation for plaintiff engaging in protected activity and opposition to defendant's unlawful employment practices in violation of plaintiff's rights secured by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sect. 2000e et seq.

168.     The plaintiff has suffered compensable loss as a result of the violation of the

defendants, including loss of civil rights, economic losses in the form of lost wages,

seniority, pension and benefits related to her employment.

## COUNT THREE: VIOLATION OF 42 USC §1983 AND THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION (DISCRIMINATION)

169.     Paragraphs 1-168 are incorporated by reference.

170.     Defendants acted under color of state law and intended to deprive Plaintiff of her

rights, privileges and immunities under federal law on the basis of her race.

171.     Defendants acted willfully, wantonly and maliciously.

172.     Defendants' actions constitute a violation of 42 U.S.C.§1983 .

173.     As a result of Defendants' violation of 42 U. S .C. §1983, Plaintiff has incurred,

and continue to incur, lost benefits, and costs and expenses, including legal fees

and the cost of bringing this action.

174.     As a further result of Defendants' conduct, Plaintiff has suffered, and continues to

suffer, severe and extreme emotional distress, including loss of self-esteem,

humiliation and embarrassment.

**COUNT FOUR: VIOLATION OF 42 USC §1983 AND THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION (RETALIATION)**

175.     Paragraphs 1-174 are incorporated by reference.

176.     Defendant's treatment, discipline and discharge of plaintiff under the circumstances detailed herein was in retaliation for plaintiff engaging in protected activity and opposition to defendant's unlawful employment practices in violation of plaintiff's rights secured by the 14th Amendment of the United States Constitution.

177.     The plaintiff has suffered compensable loss as a result of the violation of the defendant, including loss of civil rights, economic losses in the form of lost wages, seniority, pension and benefits related to her employment.

**COUNT FIVE: VIOLATION OF 42 USC §1985 – CONSPIRACY**

178.     Paragraphs 1-177 are incorporated by reference.

179.     Defendants acted in concert to effect the retaliation of termination against Plaintiff described above based upon the Plaintiff's race and color.

180.     In so doing, Defendants acted as a conspiracy in violation of 42 USC §1985.

181.     The plaintiff has suffered compensable loss as a result of the violation of the defendant ,including loss of civil rights, economic losses in the form of lost wages, seniority, pension and benefits related to her employment.

## COUNT SIX: VIOLATION OF C.G.S. 58A

182.    Paragraphs 1-181 are incorporated by reference.

183.    Defendants' actions deprived the Plaintiff of her rights, privileges and immunities secured and protected by the constitution of the State of Connecticut and the Constitution of the United States on account of her race and color.

184.    Said deprivation was a violation of C.G.S. 46a-58(a).

185.    The plaintiff has suffered compensable loss as a result of the violation of the defendant, including loss of civil rights, economic losses in the form of lost wages, seniority, pension and benefits related to her employment.

## COUNT SEVEN: VIOLATION OF C.G.S. 60(A)(4)

186.    Paragraphs 1-185 are incorporated by reference.

187.    The Defendant employs three (3) or more persons and is an "employer" as defined in Section 46a-51(10) of the Connecticut General Statutes.

188.    The acts, practices, and treatment of the Defendant intentionally subjected the Plaintiff to discrimination on the basis of her race in violation of the rights secured by C.G.S. §46a-60 et seq.

189.    The plaintiff has suffered compensable loss as a result of the violation of the defendant, including loss of civil rights, economic losses in the form of lost wages,

seniority, pension and benefits related to her employment.

## COUNT EIGHT: DEFAMATION (AS TO INDIVIDUAL DEFENDANTS ONLY)

190.    Paragraphs 1-189 are incorporated by reference.

191.    In communicating the false and defamatory statements, defendants intended to convey that Plaintiff was a danger to herself and the community and the person or persons to whom the defamatory matter was communicated understood the words to have such a meaning, as evidenced by the Plaintiff's arrest.

192.    The defendant State of Connecticut Department of Corrections willfully ignored the only evidence from an independent source, which stated unambiguously that Plaintiff never made the statements alleged by Defendant Gonzales, for which plaintiff was suspended.    The said defamatory statements of DOC employees and/or agents, as aforesaid did and were calculated to cause great injury to the Plaintiff.

193.    The Defendant was not privileged to publish said allegations.

### V.    PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

Assume jurisdiction over this matter.    Issue a declaratory judgment that:    The defendants have discriminated against Ms. Smith on the basis of her race or color by subjecting her to terms and conditions of employment different from those applied to

white employees, by subjecting her to racial harassment, by retaliating against her and by disciplining her without adequate grounds because of her race;  Defendants' acts of intentional racial discrimination, retaliation and unlawful harassment in the workplace against Ms. Smith violated her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. §1983, C.G.S. §58a and C.G.S. §60(a)(4).  Award Ms. Smith actual and compensatory damages in the amount of $1,000,000 against each and every defendant, jointly and severally; and punitive damages in the amount of $1,000,000 against each and every defendant, jointly and severally.  Award Ms. Smith reasonable attorneys fees and costs pursuant to 42 U.S.C. §1988 and 42 U.S.C. § 2000e et seq.  Award Ms. Smith back pay and related employment benefits including interest.  Award Ms. Smith such other and further relief as justice may require.

**JURY DEMAND**

Plaintiff, EUNICE SMITH hereby demands a trial by jury as to all issues.

THE PLAINTIFF

By _____
Cynthia R. Jennings
The Barrister Law Group, LLC
211 State Street
Bridgeport, CT 06604
Federal Bar No. ct21797
Tel: (203) 334-4800
Fax: (203) 333-7178
E-mail: Cynthia.Jennings@sbcglobal.net

**CERTIFICATION**

This is to certify that a copy of the foregoing has been sent via FEDEX EXPRESS Mail,

to the following counsel of record on this 14th day of December 2004.

Jane B. Emons
Assistant Attorney General
Office of The Attorney General
State of Connecticut
55 Elm Street
Hartford, CT 06106

_____
Cynthia R. Jennings, Esq.